We have five cases scheduled for decision today in oral argument. Three of the cases are on oral argument. Two of the cases are on briefs. And before we get to the first case, we have a court matter to attend to. And this is for the admission of one of my law clerks into admission to the bar of the U.S. Court of Appeals for the Federal Circuit. Amin. This is Omar Amin. Seems like only yesterday you joined my chambers. And they say that time flies when you're having fun, but I think it flies even faster when you're working hard. That being the case, I bet it's really flown fast for you, given how hard you work. You earn the respect of your peers. And given the excellence of your work product, I'm sure that you will have a very fulfilling career. So with that, I turn it over to my colleague, Judge Wallet. Thank you, counsel. Given the extraordinarily high standards that Judge This candidate is well qualified. Do I hear any objection? Hearing no objection, the motion is carried. Will the clerk administer the oath, please? Raise your right hand, please. Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor in this court, uprightly and according to law, and that you will support the Constitution of the United States of America? Welcome to the bar of the United States Court of Appeals of the Federal Circuit. Let's move to our first case of the day, Haggard v. United States. Counselor, you've divided your time. You're reserving six minutes for rebuttal. Is that correct? I reserve three minutes, Your Honor. Three minutes, okay. Thank you, Judge Reina, and may it please the Court. I'm David Frederick for Denise and Gordon Woodley. The Court of First, it refused to order class counsel to share information that would have enabled the Woodleys, who are members of the class, to understand how their property had been valued. Second, it awarded common fund attorney's fees, even though class counsel was adequately compensated under the URA statute. With respect to the first point, disclosure is fundamental to being able to determine whether or not the allocations could be double-checked. Double-checking is important to determine whether or not a class settlement is fair. The requisite documents, the appraisals, the spreadsheets, the formulas for determining how each class member's property was valued were never disclosed by class counsel, and so the Court of Federal Claims never had the means by which it could exercise its fiduciary responsibility to the class to double-check. I understand your concerns, and it seems to me that it would have been pretty easy to turn over a few documents, but didn't the Court of Federal Claims at the Fairness Hearing get information about the differences in the valuation of the two properties at issue? Only in the roughest of senses, Judge Hughes, what it got was a conclusory analysis that showed what each person was being allocated, but there wasn't... That's what I'm getting at. It seems to me that what you're asking us to do is to step into the shoes of the trial court and look at this almost de novo, and if I were to do that, I suspect I would agree with you, but he had some information about the difference in valuations. He had information about the overall numbers, the overall methodology and the like, and isn't this something that we're reviewing under an abusive discretion standard? Yes, you are, but it is an abusive discretion when we're talking about property and we don't even get an opportunity to see what the appraisals are, and we don't know what the appraisals say for the so-called representative properties on which the square footage is being determined, the dollar versus square footage. We're dealing with a settlement agreement, correct? I beg your pardon? We're dealing with a settlement agreement. Yes, we are. And did your clients vote or join the settlement? They opted in at the beginning, but they objected to the settlement, and they objected at the fairness hearing. They sent in their form objecting. They have a perfectly valid objection to the settlement and are herewithstanding to object to the settlement, and the settlement objection is based on the fact that even the Court of Federal Claims, which sought to get information, didn't get the right information to determine whether or not the allocations were fair, and double-checking is fundamental to determining whether or not a class settlement is fair. Here, that didn't happen, and the kinds of information that would have been important, which show that a neighbor two doors down with virtually identical waterfront property, slightly lower square footage, got more than twice as much an allocation as the Woodleys got. The court never asked the questions to determine how could that be, and as the government notes in its reply brief, there are obvious problems methodologically with the way the appraisals and the valuations had been done. Now, if I could... You'd agree that class counsel bears the same fiduciary obligation as any other attorney to their client, wouldn't you? Of course. Then I think all your arguments are moot, because given that fiduciary obligation, even whether they asked or not, they should have been provided with that information. We agree with that, and this is not information that is anything other than the work product that an attorney would ordinarily be obliged to give his client, and to the extent that they are purporting to represent the class, this is information that class members as clients would ordinarily be entitled to get, but this was information that not only was withheld from the class, it was not disclosed to the court, so the court couldn't discharge its responsibility either. If I could turn quickly to the common fund issue, I want to make one very clear... Before you do that, how many class members objected to the settlement? Just a small handful, and it... Mr. and Mrs. Woodley, who else? Mr. Young objected and expressed his objection at the hearing in terms of his statement that the valuation wasn't fair because he thought that the Woodleys should at least be getting what he would have gotten. Now, on the common fund issue, the key... Going back to this, we're looking at this, whether there was, at the fairness hearing, and whether the settlement is fair. If you have just a few class members that are not satisfied with the settlement, does that turn the entire settlement not fair? I mean, you have a vast majority of the class members who believe that it is fair. Yes. Our submission, Judge Reyna, is that if Judge Leto did not have the tools to determine whether or not the settlement was fair for just a few, it wouldn't be fair for all, and the government notes in its reply brief that there are massive methodological problems that are present in this particular settlement. On the common fund issue, the one takeaway that I want to leave you with before I have to sit down before rebuttal is that common fund attorneys' fees are only allowed where there is an inequity. Inequity is the key prerequisite to determine common fund attorneys' fees. There can be no inequity where the statute provides for all fees and expenses that are actually incurred, and that is the way the statute is ordered. The statute mandates that the United States pay all fees and expenses actually incurred. So there is no inequity that a common fund here could address, and that has been true from Supreme Court precedent dating from the 1880s all the way to the present. There is not a single case that we have found where there has been no inequity and statutory fees plus a common fund attorney's fee has been awarded. Now, crucially, what the court below did was to assume that there had been some issue here, but what it did was it awarded an amount that amounted to approximately 17 times the Lodestar. We're talking about fees even for their paralegals that if you lump all of their hours together represented something like $4,000 per hour for every professional in class counsel that was awarded attorney's fees. And this amount comes directly out of the just compensation that is awarded to the class. And we would submit that the amount is grossly disproportionate and there is no inequity to address. I'd like to save my remaining time for a vote, please. Thank you. Ms. Sprague? Thank you, Your Honor. May it please the Court, I'm Mary Gates Sprague for the United States. We are here today having confessed error and supporting the appellants on both issues. What is the error that you believe that the government made? Your Honor, when the Woodleys first presented the nondisclosure issue on March 4, 2014, and then at the fairness hearing presented their argument that common fund fees may not be awarded as a matter of law, the United States failed to appreciate and investigate these objections and take a position at that time. It's not an error of law. It's not that the government articulated a position that you wish to take back. Basically, the government didn't do anything. The error was in not doing anything, Your Honor. Is that an error? Your Honor, we felt that it was an issue that needed to be presented to the Solicitor General of the United States for a decision as to our position in this case, and that was done. So you're supporting the Woodleys' position in this? Yes. Yes, Your Honor. I would ask you about the disclosure issue. Your co-counsel has just said that you recognize now that there are massive flaws in the methodology. Why didn't you find that out before? The methodology must have been presented to you even if the underlying numbers hadn't. I mean, honestly, the Justice Department has an obligation not just to represent the government. It has an obligation to represent everybody. So if you know now the methodology wasn't right, why didn't you look at it more carefully then? Your Honor, the settlement was based on a $110 million payment to the class. It was left up to class counsel to allocate that money among the clients. Is that the way you settle these rails-to-trails cases? This is an unusual case, Your Honor. It seems to me like you have an obligation not to just determine that the overall number is fair, but that the way the number is distributed is fair, too. Your Honor, certainly that will be the case moving forward. That was not done in this case because it was left to class counsel. What was done in prior cases? Your Honor, there are all different ways of resolving Trails Act cases, but often there's a joint appraisal process where there's one appraisal and these issues don't arise. There's a joint appraisal and the United States pays $110 on the dollar. So this was an unusual situation. Do you dispute with any of the appraisals that were done? Pardon me, Your Honor? Do you dispute any of the appraisals that were undertaken? Your Honor, there were two different appraisals for the representative parcels that were very different in their methodology and their ultimate conclusions. Moreover, the United States appraiser looked at every individual property and appraised each property based on its individual characteristics. The class appraiser appraised 22 parcels and then extrapolated to what were assertedly similar properties. And so there was significant disagreement. There's a high level of difference among the valuations. So is the dispute here over the methodology or is it over that the Woodleys got less? Your Honor, I believe that what has been revealed is that the methodology is flawed and it's not simply a question that the Woodleys are dissatisfied with their own amount. Why was the methodology then not challenged at the fairness hearing? Because, Your Honor, the United States did not look at the way class counsel allocated the settlement of $110 million among the clients. The United States had taken a hard look. Maybe that's the error that the government committed. They just simply did not say, how did you get these numbers? Correct, Your Honor. That should have been done. And that is what we've learned from this case. But having the error revealed, we could not report to this court that it was harmless error. It would have been much more convenient to say, move along, move along, nothing to see here. Has the government seen the documents showing the underlying methodology that your friends here with the appraisals and the spreadsheets? And we took a careful look at them when the Woodleys raised this issue on appeal. And that revealed how they got from the appraisal to the individual amount. Wait, so do you know why the difference between the Woodleys' property and the other property is so substantial? Yes, because once you have the appraisals and the spreadsheets, you can see how the numbers flow. And it turns entirely on the assigned dollar per square foot value. They were assigned different values. The question is why they were assigned different values. And the answer is in the extrapolation methodology, which we believe has a mathematical flaw, because as the size of the property increases, the value of the total property decreases, which cannot be the case. It may be that the marginal value of a square foot decreases, but it can't be that the total value of the property decreases. And that becomes apparent as soon as you see the documents that the Woodleys requested. Does this, at least what you think of as an error, affect other properties? Yes, Your Honor. It goes to several valuation groups. There were different methodologies used in different groups. There was not just one single methodology, so that each group has a different formula. I mean, there's the same basic formula, but the way the extrapolation worked was different. The class members did not even know which group they were in or which the representative parcel was for their group. They didn't have the basic information. I would like to turn to the common fund issue, which we believe— We have about three seconds left, so make it quick. Your Honor, I would reiterate there is no precedent supporting the award of a common fund percentage of recovery on top of a reasonable statutory fee calculated by the reasonable hours times the reasonable rates. Equity does not support such an award.  Thank you, Your Honor. Mr. Phillips? Good morning, Your Honors, and may it please the Court. I think I'd like to start by asking the Court to step back for a second and try to understand the purpose of the requirement of notice. The purpose of notice here is not to ensure that every single member of this class is fully satisfied by whatever ultimately ends up being the amount allocated to that individual plaintiff. The purpose of notice is to inform everybody in the class as to what their outcome will be. Oftentimes, that's based on a formula. In this case, it was based on very specific numbers. It was exactly down to the penny, how much money each of them would receive. Clients are entitled to know the basis for that formula, are they not? They are entitled to know exactly how the formula was acquired. And the Court of Federal Claims' finding on this, which I don't hear anybody challenge, it's clearly erroneous, is the parties with the assistance of experts and a senior judge of this court agreed on the fair market values for the parcels at issue. So what they knew was the methodology was that an appraiser had done a very sophisticated analysis of representative parcels, tried to apply it to each of the individual properties. No, no, no. Don't stop me. The government had the opposite. So it's your argument that your clients provided all the information requested by the wood lease? I don't know that it was all. Actually, it was all the information that could have been useful to the wood lease because we don't have a specific appraisal of their particular property. What we have is the allocation that was put in that we took from the basic appraisal of the representative properties and then gave them the specific numbers as to exactly what was their entitlement. And they, of course, the purpose of this exercise, right, is to give them notice and an opportunity to object at the hearing. They clearly satisfied that both as a matter of Rule 23 and as a due process matter. And if they have a complaint... And if they have the underlying information, they still have the full opportunity to object? Well, the question is, one, they could have asked for discovery. They didn't do that. Two, they could have spoken to the appraiser. They didn't do that. They asked their attorney. They could have asked for discovery against their attorney? They could have asked for discovery as to what went into the process of the final settlement. Why should they? That happens all the time. Why should they? Why shouldn't they just ask their lawyer? They did ask their lawyer. But the question is not, well, what do you do about it? Let's assume, which I don't think is true, that somehow there's been a breach of a duty in this context. That's not a duty that undermines the core settlement in this particular case. If he's got a complaint, he's got a malpractice claim he wants to bring, fine. If he's got a complaint with the ethics, that's fine. Nobody else complained about this. I think it's worth stepping back from. And the reason why Judge Leteau proved this in total is he's looking at a situation where 252 of the 253 plaintiffs are fully satisfied with the bottom line number in this situation. And they had exactly the same information. They didn't complain about the adequacy of the disclosures. They didn't complain about anything. They thought this is an excellent deal. And I don't know what your experience is with class settlement disclosures, but this one provided a whole lot more information, at least than the ones I normally receive in the ordinary course of business, because I knew exactly how much money I was going to get and exactly how much the attorney's fees were going to take out of that particular approach. So from my perspective, at least, the Court of Federal Claims having said specifically that this went through a process that was absolutely fair got to the right result. And again, I don't think whether they had a basis for objecting individually or being unhappy with it individually necessarily gets you home. But it wasn't as though the Court of Federal Claims ignored their objection. He specifically asked the Department of Justice lawyer, how do you explain the disparity between the Woodley's property and the other property? And the Justice Department lawyer said, it's based on the frontage on the lake, the lakeside frontage. It will make a huge difference regardless of the numbers. The methodology argument, you might have noticed that Mr. Frederick twice specifically describes the methodology argument as only coming up in the reply brief of the United States. I mean, talk about the ultimate sandbag. They didn't even raise it in the opening brief so that we have an opportunity to respond to it. But the reality is as the size of the property gets larger, the demand for the property decreases. We all know that because there's a much larger demand for very, very large properties. So the idea that there's going to be a falloff should come as no shock. And the notion that the government couldn't identify this methodological issue somewhere sooner? Wait a second. Back up and say that again. As the size of the property increases, the market of people who are interested in property that large, with numbers that large, decreases. Yeah, I think you misspoke. Oh, I may have. In any event, Your Honors, I think, frankly, the Woodleys don't have a basis for complaining about anything here. But what seems to me absolutely unassailable is that there is no basis for doubting that the determination by Judge Leto, that the class was fair and adequate and that the class settlement was fair and adequate. What's your response to your colleague's argument that methodology undermined the entire settlement? Not just what the Woodleys were entitled to, but all appraisals were flawed. That's based on pure speculation of something that was never presented to Judge Leto. And what he saw in the methodology was that a set of papers were submitted at the mediation by the plaintiffs, identifying specific values to those properties. The defendant, the United States government, came in, contested maybe not every single one, but a significant number of them, according to the DOJ lawyer. A new spreadsheet was then modified to reflect that, and then the government said, I can only get you to $110 million, so you're going to have to find a way to come down. And they pro-rata discounted everybody by 10%. And that's how they came out with the number. As Mr. Stewart said to the Judge Leto, we didn't put those numbers in. The idea that somehow, they said, here's a $110 million check, now you figure out how to hand it out. That's not what happened. What happened is we came in with very specific numbers, and the mediator, a senior judge of the Court of Federal Claims, evaluated it, conducted negotiations with appraisers and lawyers there, and came out with a set of numbers that ultimately took care of it. Can you get to the attorney's fees issue? Now, the attorney's fees issue, Your Honor. First of all, I think it's important to recognize that under any circumstances, there's a contingency component to this case. There are 64 plaintiffs who signed a contract saying that they are entitled to a contingency. Second of all, there was no dispute in the district court that this is a common fund. So that's not an issue, whether we have a common fund here. It's a little late in the day to come in here and complain that there's no common fund under these circumstances. Indeed, the pure equity argument that my good friend, Mr. Frederick, makes here is an argument that was never presented to Judge Leto. He was only presented with the question of whether or not, essentially, the URA preempts. The common fund doctrine is an equitable doctrine. It's designed to make sure that, essentially, you don't have free riders in a class action settlement. Exactly. So that one party doesn't bear all the attorney's fees. But in this scenario, the statute expressly provides for the award of reasonable attorney fees. Right. Paid by the government. Exactly the same. So nobody, not a single party to this class action settlement is bearing unfairly the cost of the action. The government's bearing the cost of the action. Two answers to that. First of all, because there is a contingent fee agreement with 64 of the plaintiffs. So those people may owe some money. And that means the other 180 are free riding off of the attorney's fees that are being paid by the 64, even though every one of them saw exactly how much they were being asked. How is that possible? They're not free riding because the government has paid the reasonable cost of the action. Some of the other people may have decided to pay more than the reasonable cost of the action. The Supreme Court, the second answer is the Benegas, and the Supreme Court specifically did. This case doesn't have anything to do with the common fund doctrine. No, but it does have to do with what do you do with a fee shifting provision, and what do you do beyond the fee shifting provision. Which helps you with the people that actually signed the contingency fee agreement, but certainly doesn't help you with the rest of the people. It doesn't mention a common fund doctrine. But that's exactly why the common fund has special implications here. Because what do the courts say about fee shifting? The fee shifting statute tells you what the losing defendant must pay in a world where we normally don't ask losing defendants to pay nickel one. And what is that reasonable number? What does the contingency fee arrive at, and what does the common fund theory arrive at? That's what the plaintiffs must pay their lawyers. That's the purpose of that. And we know that 64 of these plaintiffs are going to pay their lawyers a significantly higher sum of money. And that's what creates the basis for the common fund as it is. Why should they free ride off of what the others are paying? Because that was the money that got us into the litigation to represent them in the first place. Do you disagree that the amount paid by the government is a reasonable fee? A reasonable fee for what a defendant, in an exception to the American rules, should pay? Yes. That's a reasonable fee. It's not a reasonable fee for what it costs. Actually, it was a standard lodestar fee. It was a standard lodestar fee. But I also believe that a contingency fee arrangement, and the common fund that I think attaches to the contingency fee arrangement, is a perfectly reasonable fee, too. And we see these approved in class actions every single day of the week. How does the case Pierce v. Messiaen implicate your theory? I don't remember Pierce v. Messiaen, Your Honor. Is that the Seventh Circuit case? The Seventh Circuit case. Yeah, well, the Seventh Circuit, it sounds as though there may be some tension on that. The problem, of course, is the Ninth Circuit, specifically held in the Sighton case, that it and both the Seventh Circuit and another circuit have rejected the idea that fee-shifting statutes preclude you from adopting the common fund theory for recompensing. The Seventh Circuit's decision doesn't really take issue or deal with, the most recent Seventh Circuit's decision doesn't take issue with the older cases, so it's kind of hard for me to figure out exactly where the Seventh Circuit squares. But the bottom line point here is that the Ninth Circuit, previously the Seventh Circuit, at least one other, and the Second Circuit have all adopted this. One of the implications of the Seventh Circuit is that where you have a contingency fee agreement and you sue under a fee-shifting statute, that if you permit the parties, for example, the class counsel, to obtain attorney's fees from the common fund, that it undermines the statute, the purpose of the fee-shifting statute, and it's contrary to the interests of the class counsel, I mean of the class, the members of the class. So in your situation, where counsel sought the common fund attorney's fees after they were awarded or after they sought the fee-shifting attorney's fees, aren't they acting against the interests of their own clients? Because that diminishes a pot, correct? Well, yes, but that's exactly why the law imposes upon the court of federal claims judge here or the district court in a regular class action, a special duty and a responsibility to protect the interests of the class. And Judge Leto specifically and expressly acknowledged that that was his obligation, and he evaluated this, and that was part of the reason why he did a deviation from the amount that we had actually asked for and the amount that was embedded in our contingent fee arrangement. But protecting the interests of the class, isn't that what the fee-shifting statute does also? Well, no, the fee-shifting statute is designed to tell you what it is that the United States should pay. The idea that there's going to be a reduction from what the class would ultimately receive, I mean, the Supreme Court identified that exact problem in Venegas and said specifically, of course there's going to be some deduction as a consequence of having to pay the fees in the contingent fee arrangement, but that's not, you know, there's nothing in the statutory schemes that's going to guarantee that every plaintiff is made whole. And indeed, it's inconceivable that every plaintiff is going to be made whole in a settlement where you're talking about $60 million that the government claims on the appraisal and about $200 million that we claim on the appraisal, and you end up at a number that's 110, and you allocate it out in a way. Mr. Phillips, are you abandoning your waiver and estoppel arguments? No, I'm not. I just think that, and I don't think the government should be heard here at all because I think it's way too late in the day. You cite New Hampshire v. Maine for that proposition, and there the court says that a party that succeeds in maintaining a position can't change that position simply because their interests have changed. How has the government's interest changed? Well, I think the government's interest is out of concern for these kinds of litigations going forward in the future. They seem to be satisfied with a fee, with a common fund. How has the interest changed? Well, their perspective on these issues changed with the size of this particular award. Previously, they were much, much smaller awards, and the attorney's fees were fairly insignificant. This one, obviously, with a common fund, is much larger. I'm not saying why is it more interested. I'm asking how its core interests have changed. That's what New Hampshire v. Maine is talking about. Well, I think its core interests have changed because they were perfectly satisfied to allow the litigation to go forward under the takings clause in the way it had before, but once it became a much larger number, it decided that it would be better to try to constrain and, as the amicus says, try to limit the attorney's fees that would be available in a way that will prevent a lot of these takings claims from being brought. Let's put it in context for a minute. I mean, there are literally hundreds of takings that go on that are never recompensed under this rails-to-trails scheme because people don't know about it, they don't understand it, and they can't get lawyers to represent them. So the idea that the government's going to work hard to try to stop additional lawyers from taking on these matters doesn't come as a shock, and the only reason they haven't done it sooner is that the amount of money at stake wasn't there. So is that statement true that they can't get lawyers to represent them when built into the statute is a provision for reasonable attorney's fees using the load-start method? And what's your basis for making that statement? Hundreds of non-representations. Well, I can only go on my co-counsel's assessment of the way the market operates. He knows that there are lots of these rails-to-trails conversions that take place and a lot of them the parties don't sue. They don't pursue them. They don't pursue them in time. I'm sorry, Judge Hughes, what was your specific question? Well, I just don't understand how when there's a provision for reasonable attorney's fees using the load-start method, the lack of fees could be a bar to bringing these cases. That's because if you are at risk of losing the case, and that's what happens in a lot of these cases. Remember, there were 500 plaintiffs. But that's the entire point of these attorney fees provisions, not just these fee-shifting provisions but every other fee-shifting provision against the government, which is to ensure that cases are brought against the government that otherwise wouldn't be brought because of the difficulty of fees. Right, and I understand that. But the problem here is that if you're going to take on a case against the United States government litigating on these kinds of issues, I mean, this has been six years of an incredible slog through an extraordinarily dense set of materials to find out at the end of the day that the United States government has now done a complete 180 in its approach, even after it's settled the particular litigation and is now asking us to go back and, in effect, start over at this stage. And the idea that somebody's going to assume all of the costs, all of those legal fees, and not get paid anything for 8, 10, 12 years? That's the same assumption whether it's the reasonable attorney fee provision or a 30% contingency fee. If you lose, you lose. Right, but if you win... If you win, you get a reasonable attorney's fee. Right, and there are reasonable attorneys... It seems to me what your objection is is that the reasonable attorney fees under the statute really isn't enough. No, my objection is that the reasonable attorney's fees under the statute defines what is reasonable to ask a defendant to pay. It doesn't answer the question of what is reasonable to ask a plaintiff to pay. I mean, the point of those statutes has nothing to do with what's reasonable to make the government pay. The point of those statutes is to make sure that reasonable attorney fees are available to encourage people to sue the government. All I can read to you, Your Honor, is Justice White's opinion in the Pentagon. What's the purpose of the fee shifting? It's to determine what the losing defendant must pay, not what the plaintiff must pay. Do you want to conclude, Mr. Scopes? I'm sorry, Your Honor. Do you have a concluding statement you want to give us? I urge you to affirm on the basis of deference. We'll add two minutes to your rebuttal time. Thank you very much. The reason why the URA exists is so that people whose property is taken can get a lawyer, and that's why dozens of these cases only have URA statutory fees, and sometimes those fees exceed the value of the property that the government took. The government notes in its reply brief that there have only been a handful of cases where this common fund theory has been trotted out, and the reason is that the URA statutory fees are reasonable and are accepted in virtually all cases, and this Court addressed that in Bywaters. The class members who signed the contingency fee contracts, they have their own separate issue. That is not part of what is before this Court. It's not even clear that... Is it possible that this issue has never come up before? Because in most of these rails-to-trails cases, the dollar amount of the property is so much lower that we would never have a contingency fee award that is bigger than the lodestar award under the URA. That is certainly a factor that I'm sure has driven the economics of the professional representations that have gone into these types of... Did that factor set the law then with respect to the common fund? I don't think that that... There's no common fund here where there is no inequity. I think you have to first breach that point first, and that is Supreme Court precedent in the Boeing case and in the Greenow case, and that's why I started with it. If you have a reasonable fee, and Mr. Phillips can't straight-facedly say this is not a reasonable fee when they've added up all of their hours and multiplied by what their market rates are, that is a reasonable fee by anybody's estimation of it. And so once you have determined that, you then have to determine is there some inequity, and there can't be an inequity where a class counsel is getting its entire fee. Now the reason why the circuits that have kept open this issue of whether or not you can have a common fund when there's fee shifting is for the one issue the Third Circuit addressed this where the defendant is bankrupt, and so the defendant can't pay the statutory fees, and so therefore you have to look to the other class members to say is it going to be fair to have this unjust enrichment bestowed upon the class members, and there's no one there to pay the statutory fees. That's the one circumstance where courts have said, yeah, we're going to leave open the possibility of common fund. Well, of course that can't happen here, notwithstanding our nation's budgetary woes. The United States is going to be good for the fees that comes under these takings claims. Now with respect to the... What about a fee shifting statute against the government that's not premised on reasonable fees?  but the Equal Access to Justice Act, for instance, that just sets a statutory cap, and you can have some adjustments to it and the like, but I don't think it requires the word of reasonable fees. I don't want to speak out of turn because I have no brief to defend some of the other fee shifting other than to say this is the most liberal permissive fee shifting statute that I've ever seen because it mandates that the government pay the fees. It mandates that those fees be what are actually incurred. It mandates that they be a reasonable fee. This Court has construed that to be the lodestar effect, so I don't think there's any situation where there may be discretion by the judge to do this, that you have that here. What about the agreement, the contingency fee agreement? It seems like the class members were aware that they were going to pay a contingency fee. How does that come into play with respect to the common fund? Actually, they weren't. If you look at the special appendix, I think it's page 234, the entry of appearance form, they weren't told when you opted into this class that there was going to be a request for contingency fees at all. And so if you're a property owner, you didn't know at the beginning of this relationship that you had with class counsel that you were going to be asking. Are you saying they didn't sign or receive a contingency fee? No, what I'm saying... Only about a third, as I understand. That's right. It's way into the process after they had opted in that they became aware that there would be any kind of a request for contingency fee at all. And I think it's basic ethics 101. What about the fairness hearing? Were they told that there was going to be the contingency fee? At the fairness hearing, it was... Disclosed? Disclosed, and the Woodleys objected to that. Their objection is on the record. Did anybody else object? I don't recall now whether there was a formal objection by others, but Mr. Woodley had gotten an ethics opinion that indicated that this was unethical to ask for a contingent common fund fee in addition to the statutory fees, and that's why he objected. On the disclosure of the methodology... Did the trial court deduct from the common fund fee the statutory fee? Yes, it did. But, yes, it did do that, and it decreased from what the class counsel had requested. So there's no double dip in here. That ethical issue you're referring to wasn't present in this case, correct? No, I think it was present in the case because what the ethics counsel opined on was that under Washington professional responsibility law, and this is property in the state of Washington, it would be unethical for a lawyer to get the statutory fee and to supplement that and augment that with a contingency fee. Okay, you're out of time. Would you like to conclude? I would. I'd like to say that this notion that the government somehow sandbagged the class counsel in the reply brief is false because what the government, as I read their brief, was responding to misrepresentations that had been made in the brief about what information had been disclosed. And notably, counsel here today cannot point you to anything where you or we or the Court of Federal Claims can actually reverse engineer and double check the allocations that were awarded to each class member. Thank you.